RCA COMMUNICATIONS, INC., Appellant, *v.* THE REGISTRAR OF PROPERTY OF BAYAMÓN, Respondent.

No. 1320. Submitted June 1, 1955.—Decided March 28, 1956.

*Fiddler, González & Nido* and *Richard J. González* for appellant. The respondent Registrar appeared by brief.

MR. JUSTICE PÉREZ PIMENTEL delivered the opinion of the Court.

RCA Communications, Inc., a corporation domiciled in New York and authorized to do business in Puerto Rico, presented for registration in the Registry of Property of Bayamón a lease contract drafted in English in which the corporation appeared as lessee.[1]

The Registrar of Property returned the document without making any entry, and entered instead a cautionary notice for 120 days,[2] with the following note:

"The present document is returned without making any entry on the following grounds: First: Because the deed is drafted in the English language without being accompanied by

---

[1] The contract was accompanied by a power of attorney also written in English since the corporation was represented in the lease contract by an attorney in fact.

[2] By order of this Court in this same case the period of 120 days was extended until the decision of this appeal.

a Spanish translation of the same and this Registry does not have an official translator; furthermore, the Registrar is not bound to pass upon documents presented for registration unless they are drafted in the Spanish language, pursuant to Act No. 22 of April 2, 1927, p. 154, which sets forth the qualifications for the position of Registrar of Property. Second: Because the allegations set forth in the present deed fall within the provisions of § 34 of the Code of Civil Procedure. Third: Because the third persons who come to the files of the Registry to inquire into the records of the properties which have been registered or as to which an entry has been made, are all Spanish-speaking persons and very few of them can read and write in the English language. Fourth: Because the Mortgage Law in force in Puerto Rico since May first, eighteen hundred and eighty, was inspired and enacted in the Spanish language in order that the documents presented for registration be so recorded in the books that they would protect the rights of third persons, and since the effective date of that law its nomenclature has not been modified by any subsequent legislation with the exception of some amended sections, its Regulations remaining identical with those originally enacted. Fifth: Because in the Constitutional Convention that assembled in the Capitol to enforce the Act approved by the United States Congress creating the Commonwealth of Puerto Rico, the following was provided in Art. I, § I (p. 35) : Upon the adoption of the Constitution all laws not in conflict therewith shall continue in full force and effect until amended or repealed or until their effectiveness ceases pursuant to their own provisions; and the cautionary notice for one hundred and twenty days provided by Act Number Thirty-Nine of April twenty-third, nineteen hundred and twenty eight is hereby entered for the foregoing reasons. Bayamón, Puerto Rico, September fifteenth, nineteen hundred and fifty four.—(Signed) Jesús J. Vergne Castelo.— Acting Registrar—Cancelled fees 50¢, No. 1º Sch."

To review this note the lessee corporation has filed the present administrative appeal.

▉ The Registries of Property were established under this name in several towns of Puerto Rico by Royal Decree of February 28, 1879. The Mortgage Law for the Colonial Provinces was established by an Act of July 14, 1893, and

the Regulations approved by Royal Decree of the 18th of that same month and year. By virtue of Article 1 of this Law, the Registries of Property continued to be situated in all the towns where they were already established. And this was the law in force in Puerto Rico in 1898 when the change of sovereignty took place.[3] All the entries and operations of the Registry were made in Spanish as a logical consequence of our racial origin and of the fact that it was the only official language in the Island at the time. That notwithstanding, the Mortgage Law authorized the inscription in the Registry of documents or titles executed in foreign countries [4] and to this effect § 52 of its Regulations provides "Documents executed in foreign countries can be recorded only after having been officially translated by the office of interpretation of languages or by any other official who may be duly authorized to do so." But with the change of sovereignty, General Order No. 192 of Headquarters of the Army, Adjutant-General's Office, of Washington, D. C., issued on December 30, 1898,[5] provided that all documents executed in English and offered for registration in Puerto Rico, when accompanied by a Spanish translation, would have, when recorded, the same force and effect as if executed in Spanish. It seems clear that during the effectiveness of this General Order, the Registrar of Property was not bound to record the document or title executed in English unless accompanied by the corresponding Spanish translation.

---

[3] Muñoz Morales, *Lecciones de Derecho Hipotecario*, Vol. 1, p. 24. That same Mortgage Law and its Regulations continued in force after the approval of the Organic Act of 1900. *Giménez et al.* v. *Brenes*, 10 P.R.R. 124; *Muñoz* v. *District Court*, 42 P.R.R. 371.

[4] Article 5 of the Mortgage Law.

[5] Published in the Official Gazette of Puerto Rico No. 23 of January 27, 1899. Said General Order provides:

"By direction of the Secretary of War, all documents executed in English and offered for registration in Cuba and Porto Rico, when accompanied by translation of the same into Spanish, shall, when recorded, have the same force and effect as if executed in Spanish."

██ The Organic Act of 1900 (Foraker Act) being already in force, our Legislative Assembly approved on February 21, 1902, to take effect from July 1, 1902, the "Act Concerning the Language to be Used in the Departments, Courts and Offices of the Insular Government." [6] With the enactment of this Act, English and Spanish became the official languages in Puerto Rico. This statute provides that in all the Departments of the Insular Government, in all the courts of this Island,[7] and in all public offices except the offices of any municipality or of the municipal courts or offices connected therewith, the English and the Spanish languages shall be used indiscriminately, and when necessary, translations and oral interpretations shall be made from one language to the other. This Act further provides that all the departments, and the courts, and the chiefs of public of-

---

[6] The complete text of this Act is as follows:

"Section 1. That in all the departments of the insular government and in all the courts of this island, and in all public offices the English language and the Spanish language shall be used indiscriminately; and, when necessary, translations and oral interpretations shall be made from one language to the other so that all parties interested may understand any proceedings or communications made therein.

"Section 2. That competent interpreters and translators shall be employed, when necessary, by any and all the departments and the courts and the chiefs of public offices to carry out the purposes of this Act.

"Section 3. No public or private document written in either of the languages herein named shall be held void on account of the language in which it is expressed.

"Section 4. The word 'written' as used herein, shall be held to refer to and include manuscript, type-writing, and printing, or combinations of any or all of them.

"Section 5. Nothing in this Act shall apply to the offices of any municipality or to municipal or police courts or the offices connected therewith.

"Section 6. This Act shall take effect from and after the first day of July, nineteen hundred and two.

"Approved, February 21, 1902."

[7] By provision of § 34 of our Code of Civil Procedure the pleadings in the insular courts may be drafted in the English language, but those in writing must be accompanied by as many copies as are required in the Spanish original, and oral pleadings should be made through an interpreter.

fices shall employ, when necessary, competent interpreters and translators to carry out its purposes and that no public or private document written in either of the languages shall be held void on account of the language in which it is expressed.

This Act authorizes the presentation for recordation in the Registry of Property of those documents or instruments drawn up in English that are recordable pursuant to the Mortgage Law without need of being accompanied by the corresponding Spanish translation. That being the case, we can conclude that General Order No. 192 was repealed by the Act Concerning the Language pursuant to the power vested in the Legislative Assembly of Puerto Rico under the Foraker Act. See *Ex Parte Rivera (a) Panchito*, 10 P.R.R. 201; *People* v. *Kent*, 10 P.R.R. 325.

■■ Now then, in connection with the drafting of public deeds, our Notarial Act provides in its § 17 "That public instruments shall be drawn up in the Spanish language, but may be in English, provided the notary, parties and witnesses know said language." The Act of March 10, 1904, in turn, as amended by Act No. 22 of April 23, 1927, provided that: "In order to be appointed a registrar of property of any registry of property of Porto Rico, it shall be necessary to be a citizen of the United States of America, over 25 years of age, to be a practicing attorney with more than five years' practice in the district courts and the Supreme Court of Porto Rico, *and to read, write and speak* the Spanish language *correctly*." (Italics ours.) Referring to the requirement of reading, writing and speaking correctly the Spanish language, Muñoz Morales in his work, *supra*, at page 53 states: "Neither was this requirement provided by the Law of 1893 [Mortgage Law], which is at present understandably considered as essential because, even admitting English as an official language of the Island, the truth is that all documents, with very few exceptions, are drawn up in Spanish; and

all the entries and operations in the Registry are made in Spanish." It is probable that in requiring the knowledge of the Spanish language, the lawmaker considered that the entries and operations of the Registry would continue to be made in Spanish. However, this reasoning is of no value at present. Our legislature has just approved Act No. 3 of September 2, 1955, entitled "Property Registry Act of the Commonwealth of Puerto Rico," eliminating the requirement of knowing the Spanish language in order to be appointed Registrar. The only qualifications now required by law are (1) to have attained the age of 25; (2) to have been admitted to the bar by the Supreme Court of Puerto Rico; (3) to have professional experience and (4) to enjoy good standing. Section 5 of Act No. 3 of 1955, (Sp. Sess. Laws, p. 9). Nor do the Rules of this Court require the knowledge of Spanish in order to qualify for the legal practice in the Island. We have already seen that the Mortgage Law, and the Language and the Notarial Acts do not forbid making the entries in the Registry in the English language. On the contrary, the Notarial Act authorizes the drafting of public deeds in English and the Language Act provides that in all public offices the English and Spanish languages shall be used indiscriminately. It is inescapable that the legislation in force does not forbid that the entries and operations of the Registry be made in the English language. Consequently, the registrars have no power to return a document or a title without making any entry in the Registry on the ground that the document presented is executed in English and a Spanish translation is not attached thereto.

■ We have not forgotten that one of the essential bases of the institution of registries is to give publicity to the civil rights recorded therein. *Criado* v. *Battistini*, 3 P.R.R. 186 (2d. ed.) ; 1 Morell, *Legislación Hipotecaria*, pp. 80 and 124. It may be urged that, in general, such publicity would be less effective in Puerto Rico if the entries and operations

of the registry were not made in Spanish since it is our vernacular language. However, the same law which made official the English and Spanish languages provided that "when necessary, translations and oral interpretations shall be made from one language to the other so that all parties interested may understand any proceedings or communications made therein." In order to carry out this provision that same law provided that the chiefs of public offices employ, when necessary, competent interpreters and translators. Hence, the possibility that the effectiveness of the publicity purpose of the registries may be in any way impaired by the use of the English language is foreclosed by the statutory obligation imposed on public officers to employ competent translators and interpreters whenever necessary.

At any rate, it is incumbent on the legislative branch and not on this Court to determine the language or languages in which the operations of the registry must be effected and, pursuant to the present state of the law, as we have previously stated, those operations can be effected in both languages indiscriminately.

The note appealed from will be reversed, and the Registrar of Property of Bayamón is ordered to pass upon and record, if proper, the lease contract presented by the petitioner.

---

MR. JUSTICE SALDAÑA, concurring.

In the Notarial Act (§ 17), and in the Language Act approved February 21, 1902, the legislative power established in a clear and manifest manner the juridical standards determining what should be our decision in the instant case: (1) in Puerto Rico a public instrument can be drafted in English and it is recordable, and (2) it is the duty of the registrar of property to pass upon and record the instrument as if executed in Spanish, and, whenever necessary, he must translate it so that the interested parties may acquaint themselves with its content.

Even when the criterion of the judges does not coincide with that of the lawmakers, a court of justice should obey and apply faithfully the only righteous and equitable sense of the law. Furthermore, to allow a registrar to refuse to record a deed on the only ground that it is drafted in English would be imparting grotesque significance to a trivial matter and losing sight of reality. The coexistence of two languages in Puerto Rico as a means to carry out commercial and industrial transactions is due to economic realities which are manifest. Any juridical ruling preventing the free and effective use of the English language in business would only obstruct our economic development and stifle the vital needs of our people, without enhancing our culture in any way. We should not confuse the juridical question raised in this case with the cultural problem of adding one language to another without losing both. And still less should it be confused with the problem of our political status.

In truth, bilingualism is an economic necessity in Puerto Rico, and if we contemplate the things of the spirit, two languages are not enough. But all this is irrelevant to the point in issue. The Legislative Assembly rejected the narrowness of view and the inadequacy for practical life, which is now sought to be imposed by judicial *fiat*, under the guise of good taste, of respect for tradition and of personal ideas on the philosophy of culture. We can never repeal legislative standards by spurious interpretations. And in any event, if construction of the law were made to depend on the circumstances prevailing at the time of its application or on the personal appreciation of the judges, the sense of the texts would be ever changing, and certitude and security, essential root of the law, would be destroyed.

The Constitution of the Commonwealth of Puerto Rico neither repealed nor modified the Notarial or the Language Act. Consequently, I cannot see how a registrar of property could lawfully deny the registration of a deed on the only

ground that it was drafted in the English language, even assuming that in Puerto Rico—in 1956—the attorneys and the rest of the people who go to the registries of property are not acquainted with that language. Nor has it any legal relevance that the registrar has no organized translation service or that he has no appropriation for such purposes. Since the law imposes on him the duty to pass upon and record a deed drawn up in English, and if necessary to translate it into Spanish in order that any interested party may acquaint himself with its content, those considerations can have no bearing on the interpretation of the legal texts. Needless to say it is likewise erroneous that the legislative standards in force defeat the element of publicity which, of course, is an essential basis of the institution of registries. Although it is true that the judicial function stands out because of its rational nature, we must admit that the legal provisions applicable in this case leave no margin or discretion to the judge and that there is no genuine vagueness in the statute. In any event, the ideal juridical estimation would find no true solution to the juridical problems in isolation, or in escaping from this world, or in the inversion of values bred by resentment, but in lucidity. For the foregoing reasons, I concur in the majority opinion.

---

MR. JUSTICE BELAVAL, dissenting.

The Registrar of Property of Bayamón denied the registration of a lease contract presented in the registry, because it was drafted in the English language and "the third persons who come to the files of the Registry to inquire into the records of the properties which have been registered or as to which an entry has been made, are all Spanish-speaking persons and very few of them can read and write in the English language." I believe that the Registrar of Property of Bayamón is correct. The element of publicity inspiring

the entire Mortgage Law would be completely defeated if wᵉ should begin with the assumption that Puerto Rico is a bilingual country.

In truth, Puerto Rico is not bilingual. It has not been so in the past and after the recent adjustments of certain educational norms in the sense that the basic education of the Puerto Rican should be in his vernacular tongue, it has less probabilities of becoming so in the future. Besides, this case involves not only the common knowledge of a language which is not our native tongue, but the technical knowledge of juridical terms, most of which are accessible only to the legal profession. If we are agreed that the Registry of Property is an institution which should remain as far as possible within grasp of the common people, as a matter of judicial reality, we cannot begin with the assumption that we are bilingual as alleged by petitioner herein.

In order to reverse the Registrar's cautionary notice denying registration, the majority opinion is based on the legislative norm set forth in the "Act Concerning the Language to be Used in the Departments, Courts and Offices of the Insular Government" of February 21, 1902, which reads:

"Section 1. That in all the departments of the insular government and in all the courts of this island, and in all public offices the English language and the Spanish language shall be used indiscriminately; *and, when necessary, translations and oral interpretations shall be made from one language to the other so that all parties interested may understand any proceedings or communications made therein.*

"Section 2. That competent interpreters and translators shall be employed, when necessary, by any and all the departments and the courts and the chiefs of public offices to carry out the purposes of this Act.

"Section 3. No public or private document written in either of the languages herein named shall be held void on account of the language in which it is expressed.

"Section 4. The word 'written' as used herein, shall be held to refer to and include manuscript, type-writing, and printing, or combinations of any or all of them.

"Section 5.  Nothing in this Act shall apply to the offices of any municipality or to municipal or police courts or the offices connected therewith.

"Section 6.  This Act shall take effect from and after the first day of July, nineteen hundred and two."

There can be no doubt that all contracts may be drafted in either English or Spanish.  The communication between contracting parties, who choose the language to be used in their contract, poses no problem of communication which ought to be regulated by the State.  The problem arises when the contracting parties wish that the contract drawn up in a language which they have freely chosen, should take effect against third persons who are not acquainted with that language, through its registration in a public registry.

Were we to construe § 1 of the Language Act *ad literam,* the Registrar of Property of Bayamón would also be correct, since one of his reasons for his refusal to record is that "the deed is drafted in the English language without being accompanied by a Spanish translation of the same and this Registry does not have an official translator," and the Act itself provides that "when necessary, translations and oral interpretations shall be made from one language to the other *so that all parties interested may understand any proceedings or communications made therein.*"  As a matter of fact, there is no organized translation service for the Registries of Property, and the Registrar has no appropriation for such service.  It is obvious that in such case the Registrar has no alternative other than to require the applicant to make the translation himself and pay the corresponding expenses. The Mortgage Law being, as it is, a statute for the interest of third persons, we feel constrained to conclude that the People of Puerto Rico is an "interested party" in this communication.

As may be seen, even when dealing with such a private means of communication as happens to be the interchange of papers between government departments or within a ju-

dicial proceeding, if a single interested person does not understand the other language it is necessary to translate or interpret the communication or declaration. However, the majority opinion is to the effect that when the whole community is sought to be informed of the conditions of the record titles of real property or of the contracts, the permissive standard of the statute as to the indiscriminate use of either of the two languages should be applied, but not the remedial standard concerning the translation of the document, which is the one establishing the equality of conditions in understanding the document.

The majority opinion seems to assume that the rule established in 1902 was the indiscriminate use of either language irrespective of whether the interested parties understood the communication. This is not the case. In 1902 the norm established was the indiscriminate use of a single language when the communication was made between institutions or persons speaking the same language, or who understood the official language in which the communication was made and the simultaneous use of the two languages when the communication was made between institutions or persons who did not speak the same language and who were not acquainted with the official language involved.

I consider this a controversial issue where the application of several principles of the historico-evolutive method might give us some profitable inductions for a more thorough judicial interpretation. See Antonio Hernández Gil—*Metodología del Derecho* 185 *et seq.* (*Editorial Revista de Derecho Privado*, 1954.)

In 1902 when the Act concerning the official language was approved, while the Foraker Act of April 12, 1900, was in force, the political relation between the United States and Puerto Rico was one of a metropolis and an overseas possession annexed to, but not forming part of, the American nation. Almost all the important appointments of the In-

sular Government officials were made by the president and fell to North Americans who did not speak the Spanish language. The reports concerning public affairs in Puerto Rico sent to different departments of the Federal government had to be drafted in the English language. But the official agencies could not escape the reality that all the reports on the public affairs of Puerto Rico were also destined to serve the purposes of a juridical society of Spanish origin, and that the official literature should be written in the Spanish language. Such a historical picture imposed the standard which we have already stated: the indiscriminate use of a single language when the communication was made between organizations or persons who spoke the same language or who were acquainted with the official language in which the communication was made and the simultaneous use of the two languages when the communication was made between organizations or persons who did not speak the same language and who were not acquainted with the official language involved. The general problem of communication was thus eliminated.

In 1954, when the Registrar of Property of Bayamón denied the registration of the deed drafted in the English language, the Constitution of the Commonwealth of Puerto Rico, of July 25, 1952, was in force and the political relation between the United States and Puerto Rico was one of association by virtue of the Puerto Rican Federal Relations Act. There is no provision in the Federal Relations Act as to which should be the official language of the new Commonwealth created. The Governor of Puerto Rico has power to appoint all Insular Government officials and most of the appointments fall to Puerto Ricans who know the Spanish language. The reports concerning the status of public affairs in Puerto Rico do not have to be sent to the corresponding departments of the Federal government, nor do they have to be drafted in English except those of the Federal agencies

operating in Puerto Rico in order to comply with the federal purposes of the association. Now, with more reason than formerly, the official agencies of the Insular Government cannot escape the reality that all the reports concerning the status of public affairs in Puerto Rico are destined to serve the purposes of a political society of a Spanish origin, and that the official literature must be written in Spanish.

The historic confrontation which we have made, instead of supporting the free election of one of the two languages, when dealing with communications between institutions or persons not speaking the same language, militates against that free election since at present the problem of communication does not interfere conclusively with any functional aspect of the public business, and the idiomatic diversity of any interested party may be preserved in order to establish a sounder communication without prejudice to the common understanding.

The evolutive interpretation of the former rule of 1902 of the use of a single language when there is no problem of communication, and the simultaneous use of both languages when such a problem arises, merely shows that the legislative norm involved is of such a nature that because it courageously confronted, with respectful altruism, the rather complex problem of official bilingualism, it is now, within its restricted application, more useful and beneficial than it was, perhaps, at the time of its adoption. Thus, we need feel no concern if in this case the norm of 1902 under this interpretation loses stability or firmness.

The norms concerning the official language must be handled cautiously. Their discussion almost always transcends from norms isolated from all other estimations to the more serious cultural and political problems of a people. Languages belong to a strict jurisprudence of values rather than to a jurisprudence of interests, since in the latter case, irrespective of their convenience in the sociological consider-

ation of the Law, the estimation is based on usefulness rather than on value. Languages are so closely intertwined with the values of the moral sovereignty deeply rooted in the juridical person that the imposition of any official language other than the individual's native tongue may become a constant source of resentment which will be an obstacle in achieving the true purposes of a political association among the people.

For the time being, as long as the political evolution of the Puerto Rican people has nothing different to say or while something different does not clearly appear from a new legislative pronouncement, we must leave all declarations concerning the indiscriminate use of a language prejudicial to the popular understanding to the immediate future, and every problem of linguistic dualism to its irremediable function in the field of culture, where penetration is performed through structures of a more thorough understanding of the human complex. *Cf. Self-Discovery in Puerto Rico*— Daniel J. Boorstein—The Yale Review—December, 1954.

For the foregoing reasons, I regret that I must dissent.